IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAVID M. WEBER,**

   **Plaintiff,**

 v.              Civil Action 2:16-cv-741
                  Chief Judge Edmund A. Sargus, Jr.
                  Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL
SECURITY,**

   **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, David M. Weber, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his application for both disability insurance benefits and supplemental security income. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 17) be **OVERRULED**, and that judgment be entered in favor of Defendant.

I. **BACKGROUND**

 **A. Prior Proceedings**

Plaintiff filed for disability insurance benefits ("DIB") and supplemental security income ("SSI") on March 7, 2012. (Doc. 10-3, Tr. 84, 105, PAGEID #: 119, 140). In both applications, Plaintiff alleged a disability onset date of February 15, 2010.[1] (*Id.*). His claims were denied initially on March 5, 2013 (*id.*), and upon reconsideration on June 1, 2013 (*id.*, Tr. 92, PAGEID #: 133). Administrative Law Judge John Robert Montgomery (the "ALJ") held a hearing on October 30, 2014 (Doc. 10-2, Tr. 49, PAGEID #: 83), after which he denied benefits

---

[1] Although this is the alleged disability onset date in Plaintiff's applications, and the date the Administrative Law Judge cited to in his opinion, during the hearing Plaintiff testified he felt he became disabled around October 2011. (Doc. 10-2, Tr. 58–59, PAGEID #: 92–93). To remain consistent, the undersigned will use February 15, 2010, as the disability onset date.

in a written decision on May 26, 2015 (*id.*, Tr. 28, PAGEID #: 58). That decision became final when the Appeals Council denied review on May 27, 2016. (*Id.*, Tr. 1, PAGEID #: 35).

Plaintiff filed this case on July 28, 2016 (Doc. 1), and the Commissioner filed the administrative record on October 24, 2016 (Doc. 10). Plaintiff filed a Statement of Specific Errors on February 22, 2017 (Doc. 17), the Commissioner responded on April 10, 2017 (Doc. 18), and no Reply was filed.

### B. Relevant Testimony at the Administrative Hearing

Plaintiff testified that he lives at home with his fiancée and two of his young children. (Doc. 10-2, Tr. 53, PAGEID #: 87). When the ALJ asked what Plaintiff felt was the major thing that would keep him from working on a full-time basis, he responded that he doesn't have strength. (*Id.*, Tr. 60, PAGEID #: 94). For example, Plaintiff stated he struggles to hold his 17-pound son. (*Id.*, Tr. 60–61, PAGEID #: 94–95). However, when asked by the ALJ how much he could lift with his non-dominant extremity, Plaintiff stated 15 to 20 pounds. (*Id.*, Tr. 66, PAGEID #: 100).

Plaintiff's issues with alcohol were also discussed. Plaintiff admitted he used to "self-medicate" with alcohol. (*Id.*, Tr. 64, PAGEID #: 98). Plaintiff testified that when he "started losing everything" he started drinking heavily and engaging in cocaine use, although he stated he no longer is using those substances. (*Id.*, Tr. 70, PAGEID #: 104). Specifically, Plaintiff stated the last time he drank heavily was "[t]he last time I found myself in a mental institution." (*Id.*, Tr. 71, PAGEID #: 105). Plaintiff admitted he suffered a major depression after he lost the ability to provide for his seven children. He takes Prozac but does not receive any type of mental health counseling. (*Id.*, Tr. 71–73, PAGEID #: 105–07).

2

In terms of daily activities, Plaintiff reported that he helps his two-year old child get dressed, dresses himself, showers, cooks occasionally, does some housework, and attends church. (*Id.*, Tr. 68, 74–75, PAGEID #: 102, 108–09). He testified that he wasn't "an invalid or anything" he "[j]ust can't do the activities [he] used to." (*Id.*, Tr. 68, PAGEID #: 102). Plaintiff stated his condition "changed [his] whole life" and that he used to play the drums but hasn't been able to hold onto the drumsticks for three years. (*Id.*).

Finally, the Vocational Expert ("VE") testified that with limitations that the ALJ posed, Plaintiff would be unable to perform any of his previous jobs. (*Id.*, Tr. 77, PAGEID #: 111). However, the VE testified that Plaintiff could work as a mail clerk, office helper, or an order caller, all of which would not involve more than frequent handling, grasping or fingering. (*Id.*, Tr. 78, PAGEID #: 112).

### C. Relevant Medical Background

*1. Physical Impairments*

On March 30, 2010, Plaintiff was treated at Riverside Methodist Hospital for right shoulder plan after slipping on ice and falling down a flight of stairs one month prior. (Doc. 10-7, Tr. 392, PAGEID #: 432). Treatment notes stated that after his fall, Plaintiff had persistent pain in his right shoulder and complains of "bilateral and numbness and tingling as well as neck pain[.]" (*Id.*). On April 7, 2010, Plaintiff saw Dr. Jonathan Forquer for, *inter alia*, his right shoulder pain and neck pain. (*Id.*, Tr. 521, PAGEID #: 561). Dr. Forquer noted Plaintiff "[c]ontinues to have radicular symptoms, numbness, tremor, and weakness of bilateral [upper extremities]." (*Id.*). An MRI showed cervical stenosis at the C6-C7 and facet arthropathy. (*Id.*).

As a result of this numbness, Plaintiff saw Dr. Girish Hiremath on February 22, 2012.

3

(*Id.*, Tr. 540, PAGEID #: 580). Because of the "severe stenosis at C6-C7," Dr. Hiremath recommended an anterior cervical discectomy with fusion and plate fixation. (*Id.*, Tr. 541, PAGEID #: 581). Plaintiff agreed and underwent surgery on March 15, 2012. (*Id.*, Tr. 711, PAGEID #: 751). In a follow-up with Dr. Hiremath on March 28, 2012, it was noted that Plaintiff's preoperative symptoms of significant shoulder pain had resolved almost completely, his complaint of right upper extremity numbness had improved significantly, and there was only minimal numbness in the fingertips of his right hand. (Doc. 10-8, Tr. 1097, PAGEID #: 1138). However, Plaintiff reported migraine headaches that began after his surgery. (*Id.*).

Several weeks later, on April 9, 2012, Plaintiff saw Dr. Forquer for these headaches. (Doc. 10-7, Tr. 432, PAGEID #: 472). The following month, Dr. Forquer recommended that Plaintiff see a neurologist. (*Id.*, Tr. 429, PAGEID #: 469). Despite his complaints to Dr. Forquer of continuing headaches, at a follow-up appointment with Dr. Hiremath on May 29, 2012, Plaintiff reported that his migraine headaches and neck pain had significantly improved. (Doc. 10-8, Tr. 1091, PAGEID #: 1132). At that same appointment, it was noted that Plaintiff had 5/5 strength in grip and a well-healed anterior cervical incision. (*Id.*).

On July 16, 2012, Plaintiff saw Dr. Herbert A. Grodner for a Social Security Disability physical examination. (Doc. 10-7, Tr. 741, PAGEID #: 781). Upon examination, Dr. Groder noted that Plaintiff had "decreased range of motion of the cervical spine," but strength was 5/5 in all muscle groups and that his grip strength was 12 PSI on the right and 8 PSI on the left with the dynamometer. (*Id.*, Tr. 743, PAGEID #: 783). Further, "[g]rasp and manipulation [were] normal." (*Id.*). Ultimately, Dr. Grodner concluded:

> Plaintiff "would have difficulty with activities that require significant physical exertion which would include repetitive lifting more than 20 or 25 pounds,

4

> climbing such as ladders or scaffolding or stairs repetitively . . . [Plaintiff] would have difficulty with activities that require using his upper extremity repetitively and turning his head repetitively. I do feel however, that he could at least attempt some type of sedentary activity."

(*Id.*, Tr. 744, PAGEID #: 784).

Plaintiff saw neurologist, Dr. William Mayr, for his migraines. (*See* Doc. 10-8, Tr. 1086, PAGEID #: 1127). At an appointment on November 27, 2012, Dr. Mayr noted that Plaintiff's "[h]eadaches continued unabated" yet he "is still drinking caffeine daily, and he is still smoking." (*Id.*, Tr. 1083, PAGEID #: 1124). Dr. Mayr opined though that he was "reassured by his MRI and blood work" since they were normal. (*Id.*). Dr. Mayr also noted that Plaintiff complained of upper extremity tremors since 2006–2007, but since "this is not a major issue, we will not focus on this[.]" (*Id.*, Tr. 1084, PAGEID #: 1125). Ultimately, Dr. Mayr diagnosed new onset intermittent migraine without aura as well as mild chronic daily headache, and recommended lifestyle modifications to include no caffeine, tobacco cessation, monitoring anxiety/depression with a regular doctor, sleep hygiene techniques, and instituting regular exercise. (*Id.*, Tr. 1083, PAGEID #: 1124).

On December 18, 2012, Plaintiff saw Dr. Hiremath for a postoperative follow up. (*Id.*, Tr. 1082, PAGEID #: 1123). At that time, Dr. Hiremath noted that Plaintiff had "a mild resting tremor in the left hand, but no significant rigidity," as well as 5/5 strength in grip. (*Id.*). A year and a half later, at another follow-up appointment on March 18, 2014, Dr. Hiremath opined as follows:

> Postoperatively, he did well with significant improvement in his symptoms suggestive of mylopathy as well as radicular arm pain. However, two months ago, he was working on a ladder and was lifting an object above his head when he had the sudden onset of right-sided radicular arm pain that follows in general C7 and possible the C8 distribution. Over the last two months, the symptoms have

5

> not improved. He notices subjective sensation of weakness into the right upper extremity as well as some difficulty with regard to the ability to grasp objects using the right hand. He denies any significant left-sided symptoms.

(*Id.*, Tr. 1080, PAGEID #: 1121).

Dr. Hiremath ordered an MRI to evaluate further Plaintiff's symptoms, which showed a synovial cyst versus a nerve root sleeve cyst at the right C7-T1 foramen, likely resulting in compression of the right C8 nerve root. (*Id.*, Tr. 1077, PAGEID #: 1118). Dr. Hiremath also noted Plaintiff still complained of symptoms suggestive of C8 radiculopathy, such as numbness and weak grasp of his right hand. (*Id.*). On that same day, April 28, 2014, Dr. Hiremath wrote a note stating Plaintiff "is unable to care for his child 100% of the time because of significant weakness in the right upper extremity as a result of cervical spine disease." (*Id.*, Tr. 1079, PAGEID #: 1120).

On July 17, 2014, Plaintiff saw Dr. Yeshwant Reddy for consideration of cervical epidural steroid injections. (*Id.*, Tr. 1062, PAGEID #: 1103). Upon examination, Dr. Reddy noted that Plaintiff had diminished range of motion in his cervical spine, some diminished range of motion in his right shoulder, but strength in the upper extremity of 5/5. (*Id.*). Ultimately, Dr. Reddy recommended a series of cervical epidural steroid injections. (*Id.*, Tr. 1063, PAGEID #: 1104).

*2. Mental Impairments*

Upon request of the Ohio Division of Disability Determination, Dr. Margaret G. Smith evaluated Plaintiff on May 9, 2012. (Doc. 10-7, Tr. 726, PAGEID #: 766). Dr. Smith noted that there were no manifest signs of anxiety observed and Plaintiff "presented as fully oriented to time, date, setting and circumstance." (*Id.*, Tr. 729, PAGEID #: 769). Although Plaintiff

reported having more difficulty staying focused, however Dr. Smith opined that while "the claimant may experience the subjective sense of reduced effectiveness . . . objective changes at a level prompting performance concerns by others are not expected." (*Id.*, Tr. 731, PAGEID #: 771). Further, Dr. Smith stated that Plaintiff had no limitations in his abilities to conform to social expectations in a work setting and that he "would be competent to handle workplace pressures for tasks that do not require much multi-tasking." (*Id.*).

Plaintiff was hospitalized on March 26, 2013 until March 28, 2013, for chief complaints of chest pain and hand laceration, although he was also evaluated regarding his depression and suicidal ideation. (Doc. 10-9, Tr. 1116, 1121, PAGEID #: 1158, 1163). Treatment notes state that Plaintiff had been off his medication for one month prior to his hospitalization, and the treatment plan moving forward was for him to restart Prozac. (*Id.*, Tr. 1135, PAGEID #: 1177). Further, Plaintiff stated "that he'd never actually kill himself because of his six children." (*Id.*, Tr. 1153, PAGEID #: 1195).

On April 25, 2013, Plaintiff was hospitalized after a reported suicide attempt via "an unknown drug ingestion." (Doc. 10-8, Tr. 1016, PAGEID #: 1057). Plaintiff expressed severe depression and hopelessness but denied any current suicidal intent when he was evaluated. (*Id.*, Tr. 1035–36, PAGEID #: 1076–77). Following his release, Plaintiff was admitted to Twin Valley Behavioral Healthcare Unit K9 on April 29, 2013. (*Id.*, Tr. 906, PAGEID #: 947). Plaintiff stated that all he remembers was "drinking a glass of wine, a couple of beers, and taking his muscle relaxant and one Dilaudid." (*Id.*). Treatment notes state that upon admittance to the hospital on April 25, 2013, he reportedly expressed "passive suicidal thoughts," but after his admission at Twin Valley he consistently denied any suicidal thoughts. (*Id.*, Tr. 906–09,

7

PAGEID #: 947–50). Plaintiff was discharged on May 7, 2013, in stable condition. (*Id.*, Tr. 908, PAGEID #: 949).

Plaintiff was again admitted to the hospital for what was described as "suicidal ideation" on January 7, 2014 until January 8, 2014. (*Id.*, Tr. 929, PAGEID #: 970). However, Plaintiff stated he did not feel well, had too much to drink, and "he made some stupid choices and that's why he is admitted." (*Id.*). Plaintiff admitted that he drinks three or four drinks a day and has more than six drinks weekly. (*Id.*, Tr. 930, PAGEID #: 971).

### D. State Agency Assessments

State Agency consultant Dr. Mel Zwissler opined on March 23, 2012, that Plaintiff suffered from several severe mental impairments that led to moderate restrictions of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Doc. 10-3, Tr. 95–96, PAGEID #: 130–31). Dr. Zwissler also noted that the record evidence did not establish the presence of "Paragraph C" criteria. (*Id.*, Tr. 96, PAGEID #: 131). Dr. Cynthia Waggoner reached the same conclusions on May 30, 2013. (*Id.*, Tr. 139, PAGEID #: 174).

On March 5, 2013, Dr. Diane Manos opined on Plaintiff's physical limitations, specifically that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and although his reaching was limited, his handling, fingering, and feeling was unlimited. (*Id.*, Tr. 98–99, PAGEID #: 133–34). Dr. Leigh Thomas made identical conclusions on May 31, 2013. (*Id.*, Tr. 143, PAGEID #: 178).

### E. The ALJ's Decision

The ALJ found that since the alleged onset date of disability, Plaintiff has suffered from

the following severe impairments: coronary artery disease; status post coronary artery bypass graft; degenerative disc disease of cervical and lumbar spine; status power cervical C6-7 fusion; status posttraumatic laceration of the non-dominant hand; asthma; affective disorder; anxiety disorder; personality disorder; and a history of substance abuse. (Doc. 10-2, Tr. 30, PAGEID #: 64). The ALJ also addressed Plaintiff's bilateral upper extremity tremors and intermittent migraine headaches, but noted they were both non-severe impairments. (*Id.*, Tr. 31, PAGEID #: 65).

>As to Plaintiff's RFC, the ALJ stated:
>
>[T]he claimant retains the following residual capacity to stand and walk for 30 minutes at a time for at least 4 hours out of an 8 hour period; sit for 2 hours at a time for at least 6 hours out of an 8 hour period; lift up to 10 pounds with the non-dominant extremity, but lift 10 pound frequently and 20 pounds occasionally with the dominant extremity; the claimant can frequently, but not constantly, perform handling, fingering and grasping with the non-dominant extremity, and constantly with the dominant extremity; he can occasionally bend, stoop, reach overhead; he must avoid concentrated exposure to temperature extremes and humidity, respiratory irritants; he would need to avoid use of ladders, ropes and scaffolds; and because of some mental health and medication effects he is limited to simple, routine tasks that are not changing through the workday and that are without strict production quotas.

(*Id.*, Tr. 35, PAGEID #: 69). In making this determination, the ALJ stated he had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (*Id.*).

The ALJ also found that while Plaintiff does have an underlying medically determinable impairment that could reasonably cause some symptomatology, upon review of the record, the evidence does not "substantiate the severity of the pain and degree of functional limitations alleged by the claimant." (*Id.*, Tr. 35–36, PAGEID #: 69–70). Specifically, the ALJ noted various inconsistencies in Plaintiff's testimony and evidence in the record. For example, the ALJ

noted that Plaintiff testified in October 2014, that he was unable to hold drumsticks for the last three years as a result of his hand impairments. (*Id.*, Tr. 38, PAGEID #: 72). Yet, on January 4, 2013, the claimant presented to the emergency room complaining of chest pain that began after performing the night before as a drummer. (*Id.*).

Accordingly, when taking these factors into account, and in considering Plaintiff's age, education work experience, RFC, and VE testimony, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (*Id.*, Tr. 41, PAGEID #: 75). The ALJ noted, however, that he mistakenly "confused the limitations regarding the dominant and non-dominant extremity, asking the vocational expert to assume greater limitations on the dominant extremity rather than on the non-dominant extremity." (*Id.*). However, the ALJ concluded this would not change the VE's ultimate conclusion.

> [A]ll of the jobs identified by the vocational expert require no more than 10 pounds lifting and carrying and no more than frequent handling, fingering and grasping. Therefore, the fact that the claimant can actually use one extremity for greater lifting, carrying, handling, fingering and grasping than the other, would not change the expert's responses regardless of which extremity has the increased ability.

(*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

**III. DISCUSSION**

In his Statement of Specific Errors Plaintiff argues that: (1) the ALJ erred in classifying his bilateral upper extremity tremors, migraine headaches, and radiculopathy as non-severe (Doc. 17 at 2–4); (2) the ALJ erred in failing to give greater weight to evidence that showed he had problems and limitations with his right dominant shoulder (*id.* at 4–5); (3) the RFC was not supported by substantial evidence because his mental impairments were not correctly evaluated (*id.* at 5–6); and (4) the RFC was not supported by substantial evidence because it failed to properly account for handling, fingering, and lifting restrictions (*id.* at 6–8).

**A. Classifying Impairments as Non-Severe**

Under 20 C.F.R. § 404.1520(a)(4)(ii), at step two of the disability evaluation process, the ALJ must determine the severity of Plaintiff's alleged impairments. "An impairment is considered severe if it "significantly limits an individual's physical or mental ability to perform basic work activities," which are defined as "those abilities and aptitudes necessary to do most jobs." *Dyer v. Colvin*, No. CV 14-156-DLB, 2016 WL 1077906, at *3 (E.D. Ky. Mar. 17, 2016) (citing 20 C.F.R. § 404.1521(b))." Plaintiff argues the ALJ erred in classifying his bilateral upper extremity tremors, migraine headaches, and radiculopathy as non-severe. (Doc. 17 at 2).

The Sixth Circuit has explained the step two analysis as follows:

> This circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n. 2 (internal quotation marks and citation omitted), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." Soc. Sec. Rul. 96–3p, 1996 WL 374181 at * 1 (1996). After an ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *5 (emphasis added). And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). Because the regulations require an ALJ to consider both severe and non-severe impairments in the remaining steps of the disability determination analysis, once a severe impairment is found, all impairments, regardless of how they are classified, will be analyzed in the ALJ's determination. *See Dyer*, 2016 WL 1077906, at *3. "For this reason, the Sixth Circuit has consistently held that an ALJ does not commit reversible error when he or she decides that some of claimant's impairments are not severe, but finds that other impairments are severe and proceeds with his or her analysis." *Id.*

Here, the ALJ found numerous severe impairments and considered the effect of all of Plaintiff's impairments, both severe and non-severe. For example, the ALJ discussed Plaintiff's tremors but noted the frequent references in the record to his grasp and grip being normal and at full strength. (Doc. 10-2, Tr. 31, PAGEID #: 65). Moreover, Dr. Mayr noted that the tremors were not a "major issue." Ultimately, the ALJ reasonably relied on this evidence in finding that the tremors did not result in significant limitations. (*Id.*). As to the migraine headaches, the ALJ relied on the fact that at Plaintiff's most recent visit with his cardiologist, he made no complaints of migraines, leading the ALJ to determine the frequency and severity of the migraines did not

cause any significant limitations. (*Id.*). Finally, the ALJ noted evidence in the record that documented right cervical radiculopathy, but when considering Plaintiff's testimony that he could lift 15 to 20 pounds, the ALJ found the impairment did not pose any additional limitations. (*See id.*, Tr. 38, PAGEID #: 72).

Thus, regardless of whether the ALJ improperly classified Plaintiff's impairments as non-severe, he considered the issues "throughout the remaining steps of the analysis [thus] render[ing] any error harmless." *Id.*; *see also Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that because the ALJ properly considered the impairment classified as non-severe "in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity," the ALJ's failure to classify that impairment as severe "could not constitute reversible error.").

### B. Problems and Limitations With Right Extremity

Plaintiff also alleges that the ALJ erred in failing to give greater weight to evidence that showed he had problems and limitations with his right extremity. (Doc. 17 at 4). Specifically, Plaintiff argues that an April 24, 2014 MRI, coupled with Dr. Grodner's findings that Plaintiff had a diminished range of motion, should have been given greater weight. (*Id.* at 4–5).

However, the ALJ acknowledged and discussed Plaintiff's upper extremity problems, including his MRI and range of motion assessment in his opinion:

> An MRI performed on April 24, 2014, of the claimant's cervical spine, revealed in part a new cystic lesion noted in the right lateral recess at the C&-T!, which might have represented a synovial cyst versus peripheral nerve root sleeve cyst with mass effect on the exiting right C8 nerve . . . The examination performed by Dr. Grodner was largely normal, with a normal gait, without the use of an ambulatory aid, the claimant was able to heel walk, perform tandem gait and squat . . . Additionally, there was no atrophy and strength was 5/5 in all muscle groups. There was some decreased cervical spine range of motion. During the

> most recent examination in conjunction with the claimant's cervical spine problems, to evaluate for cervical epidural steroid injections, on July 17, 2014, the claimant's posture, transfers and gait were normal and he was able to heel and toe walk. Although the claimant did have diminished range of motion in the cervical spine, strength in the upper extremity was 5/5 and sensations were intact. The claimant's right shoulder examination did show also some diminished range of motion in all directions compared to the left. There was also some pain on abduction. The claimant's lumbar spine examination was normal and the claimant's lower extremity neurological examination was normal.

(Doc. 10-2. Tr. 32–33, PAGEID #: 66–67).

This portion of the ALJ opinions makes it is clear that the ALJ explicitly considered the evidence Plaintiff argues should have been given greater weight. Yet, the ALJ found that after reviewing the record in its entirety, the objective evidence did not substantiate the severity of the pain and degree of functional limitations alleged by Plaintiff. (*Id.*, Tr. 36, PAGEID #: 70). And when "objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ 'has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.'" *Hohnberger v. Comm'r of Soc. Sec.*, 143 F. Supp. 3d 694, 701 (W.D. Mich. 2015) (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x, 794, 801 (6th Cir. 2004)).

Here, the ALJ found the "modest findings" in the record were not indicative of significant upper extremity problems. (Doc. 10-2, Tr. 37, PAGEID #: 71). Plaintiff himself testified that he is responsible in part for the care of two children under three. (*Id.*, Tr. 38, PAGEID #: 72). Additionally, the ALJ noted that Plaintiff had full upper extremity strength, performed "side work" for some friends until February 2012, and evidence suggests that he continued as a drummer despite his testimony that his symptoms caused him to give up drumming three years prior. Accordingly, with these inconsistencies present in the record, the

14

ALJ did not err in giving the MRI findings and range of motion limits less weight than Plaintiff would have liked. *Hairston v. Comm'r of Soc. Sec.*, No. 14-13218, 2015 WL 4633935, at *6 (E.D. Mich. Aug. 3, 2015) (noting that the "Sixth Circuit has consistently upheld the discretion vested in ALJs to weigh conflicting record evidence in assessing a claimant's disability status") (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

### C. Mental Impairments Within RFC

In terms of mental impairments, the ALJ found Plaintiff had an affective disorder, anxiety disorder, personality disorder, and history of substance abuse, all of which were deemed severe. (*See* Doc. 10-2, Tr. 30, PAGEID #: 64). However, the ALJ ultimately found that these severe impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, 12.08 or 12.09. (*Id.*, Tr. 33, PAGEID #: 67). In particular, the ALJ found that Plaintiff did not meet the "paragraph B" or "paragraph C" criteria. (*Id.*, Tr. 33–34, PAGEID #: 67–68). The ALJ observed that to satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following:

> Marked restriction of activities of daily living; marked difficulties in maintain social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

(*Id.*, Tr. 33, PAGEID #: 67). Courts have held this recitation is an accurate summation of how the Commissioner uses the four criteria in "paragraph B" to assess the severity of functional limitations imposed by a mental impairment." *See Cooney v. Colvin*, No. 4:14CV-00059-HBB, 2015 WL 632312, at *4 (W.D. Ky. Feb. 13, 2015) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1,

12.00C). The "paragraph C" criteria also requires that the mental impairment result in repeated episodes of decompensation, each of extended duration. *Id.* at *8.

In evaluating Plaintiff's mental impairments, the ALJ considered the state agency opinions, the report of Dr. Smith, reports throughout the record, including the psychiatric hospitalizations, as well as the hearing testimony. (Doc. 10-2, Tr. 33, PAGEID #: 67). After his review, the ALJ concluded that "[w]hile the claimant does have functional limitations, these are not at listing level." (*Id.*). Specifically, the ALJ noted that Plaintiff had not experience any episodes of decompensation. (*Id.*, Tr. 34, PAGEID #: 68).

Plaintiff disagrees. He argues that the record documents several psychiatric episodes of decompensation that meet the criteria. (Doc. 17 at 5). The ALJ held otherwise, finding that Plaintiff's mental health issues appeared situational in nature, noting that Plaintiff himself stated his admissions were due to consuming too much alcohol, and the record reflects Plaintiff's denials that he had suicidal ideation upon admission. (Doc. 10-2. Tr. 39, PAGEID #: 73). However, even if we assume Plaintiff's psychiatric hospitalizations were considered severe enough to be classified as episodes of decompensation, as noted above, he would have needed to have three episodes within 1 year, or an average of once every 4 months, *each lasting for at least 2 weeks*. Plaintiff's hospitalizations do not meet that criteria, as his alleged episodes never lasted the required two weeks. Thus, because Plaintiff has not suffered from repeated episodes of decompensation, each of extended duration, the ALJ correctly opined that the "paragraph B" and "paragraph C" criteria are not satisfied. *See Morrison v. Comm'r of Soc. Sec.*, No. 1:13CV722, 2014 WL 7409752, at *8 (S.D. Ohio Dec. 31, 2014).

Further, Plaintiff argues the ALJ incorrectly failed to include any limitations in the RFC

reflecting his trouble being around people and out in public, or with his concentration issues due to pain or anxiety. (Doc. 17 at 6). However, Dr. Smith found that there were no manifest signs of anxiety observed and Plaintiff "presented as fully oriented to time, date, setting and circumstance." (Doc. 10-7, Tr. 729, PAGEID #: 769). Moreover, Dr. Smith noted limitations in Plaintiff's abilities to conform to social expectations in a work setting but ultimately found he would be competent to handle workplace pressures for tasks that do not require much multi-tasking. (*Id.*, Tr. 731, PAGEID #: 771). Thus, the ALJ's reliance on Dr. Smith's opinion, (Doc. 10-2, Tr. 40, PAGEID #: 74) (stating "the undersigned's limitations arising out of mental impairments are based on the opinion of Dr. Smith"), was reasonable and consistent with the record. Accordingly, the ALJ properly evaluated Plaintiff's mental impairments in reaching the opined RFC.

### D.  Handling, Fingering, and Lifting Restrictions Within RFC

Finally, Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ failed to give any restrictions regarding his handling and fingering with his right hand, as well as lifting limitations due to significant weakness in his upper extremity as a result of his cervical spine disease. (Doc. 17 at 7). Further, Plaintiff argues that because Dr. Hiremath stated it would be difficult for Plaintiff to pick up his newborn child, the RFC finding that he can occasionally lift twenty-pounds with the non-dominant extremity is not supported by substantial evidence. (*Id.* at 8).

In determining whether Plaintiff's RFC is supported by substantial evidence, the Court "must look at the record as a whole." *Cole v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 738, 752 (E.D. Mich. 2015). This review encompasses examining the relevant evidence in Plaintiff's case

17

record, including statements about what Plaintiff can do "'provided by medical sources' and 'descriptions and observations of [Plaintiff's] limitations from [his] impairment(s).'" *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 603 (S.D. Ohio 2015) (citing 20 C.F.R. § 404.1545(a)(3)).

The Court finds no error in the ALJ's RFC determination. First, both state agency examiners found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and although his reaching was limited, his handling and fingering was unlimited. (*See* Doc. 10-3, Tr. 98–99, 143 PAGEID #: 133–34, 178). Indeed, as the ALJ noted, Plaintiff admitted at his hearing he could lift fifteen to twenty pounds with his non-dominant extremity. (Doc. 10-2, Tr. 66, PAGEID #: 100). Second, the ALJ recognized that Dr. Grodner opined that Plaintiff's grasp and manipulation were normal. (*Id.*, Tr. 37, PAGEID #: 71). Finally, the ALJ noted the fact Dr. Hiremath had opined Plaintiff would be unable to care for his child 100% of the time, but explained that inconsistent statements from plaintiff detracted from his credibility. (*Id.*, Tr. 38, PAGEID #: 72). Thus, the hypothetical on which the VE relied accurately portrayed Plaintiff's limitations.

As a final note, the ALJ recognized that he had mistakenly confused the limitations regarding dominant and non-dominant extremities, but the Court agrees with the Commissioner and the ALJ that this would not have changed the VE's testimony. The jobs identified by the VE required no more than ten pounds lifting and carrying, regardless of which extremity, non-dominant or dominant, was more restricted. Accordingly, substantial evidence supports the ALJ's RFC determination. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 009) ("Even if there is substantial evidence in the record that would have supported an opposite

conclusion[,]" the Court must give deference to the ALJ's decision if it is supported by substantial evidence.).

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 17) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: June 1, 2017   /s/ Kimberly A. Jolson
                     KIMBERLY A. JOLSON
                     UNITED STATES MAGISTRATE JUDGE